### In re PHOTO PROMOTION ASSOCIATES, INC., Debtor.

### Jeffrey L. SAPIR, Trustee in Bankruptcy of Photo Promotion Associates, Inc., Plaintiff,

### v.

### COPPINGER COLOR LAB, INC., Defendant.

Bankruptcy No. 84 B 20417.
Adv. No. 87 Adv. 6001.

United States Bankruptcy Court,
S.D. New York.

April 30, 1987.

Siegel, Sommers & Schwartz, New York City, for trustee and plaintiff; Leonard Schwartz, of counsel.

Brown, Dobson, Burnette & Kesler, Chattanooga, Tenn., for CPQ Colorchrome Corp.; Scott N. Brown, Jr., of counsel.

Warshavsky, Hoffman & Cohen, P.C., New York City, for CPQ Colorchrome Corp.; Stephen D. Hoffman, of counsel.

## DECISION ON TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR A DISMISSAL OF DEFENDANT'S COUNTERCLAIM

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The trustee in bankruptcy in this converted Chapter 7 case has moved for partial summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56 for an order dismissing the defendant's second and third counterclaims contained in paragraphs 15 and 16 of the answer on the ground that the defendant cannot assert a secured claim or a Chapter 7 administration expense claim against the trustee as a matter of law.

## FACTS

The debtor, Photo Promotion Associates, Inc., filed with this court a petition for reorganizational relief under Chapter 11 of the Bankruptcy Code on October 4, 1984 and continued to operate its business as a debtor in possession pursuant to 11 U.S.C. § 1108 until this case was converted for liquidation under Chapter 7 of the Code on March 13, 1985, at which time the trustee in bankruptcy was appointed.

The debtor, a New York corporation, was engaged in the business of selling family and individual photographs mounted on wooden plaques to customers obtained at facilities maintained in department and chain stores. The defendant, C.P.Q. Colorchrome Corp., a division of Coppinger Color Lab, Inc., is a corporation located in Cleveland, Tennessee and organized under the laws of that state. The defendant is engaged in the business of processing photographs.

In December of 1984, two months after the Chapter 11 petition was filed, while the debtor was operating as a debtor in possession, and before it was converted for liquidation under Chapter 7 of the Bankruptcy Code, it engaged in a transaction with the defendant. The defendant concedes that it was then aware that the debtor was operating under the *aegis* of Chapter 11 of the Code. This transaction is described in the affidavit of Gene W. Harrell, Vice President of Marketing for the defendant, sworn to April 22, 1987, which was submitted in opposition to the trustee's motion. Mr. Harrell stated in relevant part as follows:

Coppinger was approached in December, 1984, by a person named Steve Peterson who came to the Coppinger facility at Cleveland, Tennessee, with a truck loaded with unprocessed photographic orders belonging to PPA. He identified

himself as a representative of Com-Tech Industries, Inc., an agent for PPA, authorized to obtain processing services on these orders as well as future orders. We believed that he was so authorized because he had the orders in his possession and the orders had PPA order bags and order forms. We negotiated the prices with Mr. Peterson and drew up an agreement which was ultimately signed by Aaron Wagman for PPA, Ron Coppinger for Coppinger, and Steve Peterson for Com-Tech. This was dated December 20, 1984. A copy is attached as Exhibit 1 to this affidavit.

Mr. Peterson told us that PPA was unable to pay cash on delivery for services and we negotiated the portion of the agreement whereby Coppinger would receive its payment directly from some of PPA's customers. We ended up designating to be paid directly to Coppinger an amount of the C.O.D. charges which PPA made to its customers which would equal 150% of our charges to PPA. This was done as a substitute to a C.O.D. delivery to PPA which at that time did not have the cash to pay us. We used 150% of our charges under the assumption that as many as ⅓ of the orders would be rejected by the customer because of delay. Any surplus we received would have been turned back to PPA.

On December 20, 1984, the debtor in possession entered into a written agreement with the defendant whereby the defendant undertook to do photo printing for the debtor in order to clear up the debtor's backlog of unprocessed orders for family portraits at specific rates. The contract provided that the debtor assigned to the defendant, as security, the accounts receivable generated by the defendant's finishing and shipping of the backlog of photo printing, which were to be applied against the defendant's printing fees, after which the balance collected by the defendant would be returned to the debtor.

The debtor's December 20, 1984 agreement with the defendant was made without notice to the debtor's creditors or to the court-appointed creditors' committee.

Moreover, the agreement was not submitted to this court for approval.

The defendant's answer admits that it: did photographic processing work for the debtor without formal approval of the United States Bankruptcy Court, and that it received payment out of the proceeds of the processing work, also without formal approval of the United States Bankruptcy Court but that such agreement was within the normal course of operation of the debtor and was authorized by 11 U.S.C. Section 1108 and other appropriate Bankruptcy Code Sections. The defendant's answer also admits that "after late December 1984, defendant was aware that the debtor was in a Chapter 11 reorganization proceeding." Additionally, the defendant's answer admits that "this defendant received a sum of $100,028.55 for processing work done for the debtor in possession."

After the case was converted for liquidation under Chapter 7 of the Bankruptcy Code on March 13, 1985, the interim trustee in bankruptcy learned that the defendant had approximately 30,452 customer orders in its possession which it had fully processed, and approximately 12,408 customer orders which were partially processed.

The interim trustee in bankruptcy entered into a stipulation with the defendant dated April 29, 1985, in so far as the 12,408 customer orders were concerned, which provided that the defendant would perform proposed future processing work for the trustee as follows:

WHEREAS, Coppinger Color Lab, Inc. has in addition to the aforementioned orders in its possession an additional number of approximately 12,408 orders on which it has done processing under the terms and conditions of an agreement which it claims that it entered into with Photo Promotion Associates, Inc. in the month of December, 1984 and which agreement the Interim Trustee believes is subject to attack, and which orders Coppinger Color Lab, Inc. is willing to return to the designee of the Interim Trustee upon the understanding that the lien, *if any*, of Coppinger Color Lab, Inc.

shall attach to the net proceeds realized by Jeffrey L. Sapir, the Interim Trustee of Photo Promotion Associates, Inc. but also subject to any attack which the Interim Trustee shall assert against Coppinger Color Lab, Inc. as well as any attack that the Interim Trustee may assert against any other transactions between Coppinger Color Lab, Inc. and Photo Promotion Associates, Inc. . . . .

(Emphasis added).

Pursuant to an order of this court dated May 7, 1985, the interim trustee's arrangement with the defendant, as reflected in the stipulation dated April 29, 1985, was authorized by this court.

The defendant alleges in a counterclaim in paragraph 14 in the answer that pursuant to the stipulation with the interim trustee, which was approved by this court on May 7, 1985:

Plaintiff Trustee and this defendant entered into a stipulation dated April 27, 1985, which was approved by order of this Court entered May 7, 1985, pursuant to which this defendant did substantial photographic lab processing work for the plaintiff Trustee, billed the Trustee for the same, received significant payments therefore, and has a balance due from the Trustee presently in the sum of $16,360.00 from and after December 31, 1985. Counterclaimant has made demand on the plaintiff Trustee for payment of the said $16,360.00, and although the same is not in dispute, the Trustee has wrongfully refused to make such payment. Counterclaimant is entitled to judgment against the Trustee in said sum together with iterest from and after December 31, 1985.

In paragraph 15 of the answer, the defendant counterclaims for $128,864.69. This figure includes the $16,360 due for work performed by the defendant pursuant to the stipulation with the interim trustee which was approved by this court in accordance with the order dated May 7, 1987. The balance of the defendant's claim relates to pre-Chapter 7 work which was performed for the debtor in possession without formal approval by this court. Includ-

ed in this figure is the sum of $30,013.55, which the defendant claims is secured by an artisan's lien under Tennessee law, and reflects the defendant's processing of 12,408 orders which the defendant turned over to the interim trustee pursuant to the April 29, 1985 stipulation and the May 7, 1985 order of this court

In paragraph 16 of the answer, the defendant alleges that after subtracting the defendant's artisan's lien claim of $30,013.55 from its total claim of $128,864.69, the remaining balance of $98,851.44 is a Chapter 11 administrative expense claim which should be allowed against the Chapter 7 trustee in bankruptcy.

In response to the trustee's motion for partial summary judgment, the defendant states that there is a genuine issue of material fact as to whether or not the debtor in possession was acting in the normal course of its business in entering into the Chapter 11 transaction with the defendant. The defendant contends that if this transaction was in the normal course of business, then the defendant and the debtor required no advance court approval to engage in such transaction.

The defendant also contends that there may be a genuine issue as to the defendant's good faith in entering into the transaction with the debtor in possession which would preclude the trustee in bankruptcy from attacking the absence of court authorization.

Additionally, the defendant urges that the issue of whether or not the defendant conferred a substantial benefit upon the debtor in possession and the estate should preclude granting the trustee's motion for a partial summary judgment.

Finally, the defendant contends that there is an issue of material fact as to whether or not the transaction between the defendant and the debtor in possession was a credit transaction at all, or a cash on delivery transaction, in which instead of cash payment, the debtor in possession paid for services rendered by immediate allocation to the defendant of proceeds of sale.

## DISCUSSION

### SUBSEQUENT COURT ORDER AND ARTISAN'S LIEN

■ In paragraph 15 in the defendant's counterclaim, the sum of $30,013.55 is claimed as secured under an artisan's lien arising under Tenn.Code Ann. § 66–14–101, which provides:

66–14–101. Right to sell unclaimed articles left for repairs.—(a) Silversmiths, lock and gunsmiths, blacksmiths, watchmakers and repairers, and artisans generally, who do work for the public, shall have the commonlaw lien, and the right, at the expiration of six (6) months from the time of the contract and leaving with them the goods or products to be repaired, developed, processed or improved, if not claimed or called for by the owner, to sell the same at public outcry after complying with the provisions of this chapter.

Pursuant to the applicable law in Tennessee, the artisan's common law lien depends on the artisan's retention of possession of the property in question and is superior to other rights in the property, including those of a conditional vendor. *Shaw v. Webb*, 131 Tenn. 173, 174 S.W. 273 (1915); *Robinson Bros. Motor Co. v. Knight*, 154 Tenn. 631, 288 S.W. 725 (1926). The trustee in bankruptcy in this case argues that the defendant shipped the processed photo prints to the debtor's customers and therefore lost its lien when it surrendered possession of the property upon which the defendant claims an artisan's lien.

The defendant responds by adverting to the stipulation with the trustee dated April 29, 1985 and the court order approving the stipulation dated May 7, 1985. The parties agreed that the defendant would process "an additional number of approximately 12,408 orders on which it has done processing" and would therefore relinquish possession of the photo prints to the customers with "the understanding that the lien, *if any*, of Coppinger Color Lab, Inc. shall attach to the net proceeds realized by" the trustee. (Emphasis added) Thus, the defendant relinquished possession of the 12,-408 processed orders pursuant to the court-authorized stipulation dated April 29, 1985 in exchange for its artisan's lien, if any, attaching to the net proceeds realized by the trustee from the processed orders. Such loss of possession was authorized pursuant to the court's order which maintained the *status quo* and allowed the parties to satisfy the customer orders. The trustee's motion to invalidate the defendant's entitlement to claim the benefit of an artisan's lien cannot be sustained as a matter of law in light of the defendant's reliance upon this court's order. Accordingly, the trustee's motion for partial summary judgment must be denied as to the defendant's counterclaim for $30,013.55, as expressed in paragraph 15 of the answer.

### CHAPTER 11 ADMINISTRATION EXPENSE CLAIM

■ The defendant's assertion of a Chapter 11 administration expense with respect to its transaction with the debtor in possession before the case was converted for liquidation under Chapter 7 of the Bankruptcy Code must be viewed in the context of the authority of a debtor in possession in a Chapter 11 case. A debtor in possession is authorized under 11 U.S.C. § 1107 to exercise the rights, powers and duties of a trustee in bankruptcy. Moreover, unless ordered otherwise, a debtor in possession is empowered under 11 U.S.C. § 1108 to operate the debtor's business. During the course of this business continuance, a debtor in possession acts as a fiduciary and has a duty to protect and conserve property in its possession for the benefit of creditors. *Devers v. Bank of Sheridan, Montana* (*In re Devers*), 759 F.2d 751,754 (9th Cir.1985); *Northwestern National Bank of St. Paul v. Halux, Inc.* (*In re Halux, Inc.*), 665 F.2d 213, 216 (8th Cir.1981).

A debtor in possession has a duty to conserve and protect estate property for the benefit of its creditors and may not sell property out of the ordinary course of business without notice and a hearing.

3 Norton, Bankr.L. & Prac., § 51.04 (1986 Supp.) (footnote omitted).

Pursuant to the defendant's written agreement with the debtor in possession, dated December 20, 1984, the defendant undertook to process the debtor in possession's backlog of unprocessed orders at specified rates. As security for the payment of the defendant's processing charges, the debtor in possession agreed to assign an interest in the accounts receivable generated from the processed orders to the extent of $7.50 per order. Admittedly, no notice of this agreement was given to the creditors or the creditors' committee of this estate, nor was court authorization sought or obtained for this transaction.

The defendant's contentions that there is a genuine issue of material fact with respect to whether or not the transaction was in the ordinary course of the debtor in possession's business; that the defendant acted in good faith and that it rendered services that were of benefit to the estate, are responses which are unavailable in this case as a matter of law. The ordinary course of business exception to the need for court authorization relates expressly to obtaining *unsecured* credit and incurring *unsecured* debt, as stated in 11 U.S.C. § 364(a). The granting of a security interest by a debtor in possession or a trustee in bankruptcy in order to operate its business is governed by 11 U.S.C. § 364(c), which reads as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, *the court, after notice and a hearing,* may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

(Emphasis added).

In *Bezanson v. Indian Head National Bank (In re J.L. Graphics, Inc.)*, 62 B.R. 750 (Bankr.D.N.H.1986) which is a strikingly similar case, a debtor in possession engaged in negotiations with a bank for the use of cash collateral. The parties entered into a stipulation which allowed the debtor in possession to continue using receivables collected from prepetition accounts receivable and provided that the debtor in possession was authorized to continue borrowing from the bank and that the bank would be granted a continuing lien on post-petition receivables. For some unexplained reason the written stipulation was not submitted to the court until the next month. When the matter was to be heard by the court the next month the debtor in possession announced that it was closing down operations and consented to conversion of the case to a Chapter 7 liquidation. The court never acted upon the application to approve the written stipulation. Three months after the conversion to Chapter 7, the trustee in bankruptcy filed an adversary complaint attacking the bank's right to collect post-petition accounts receivable as to which the trustee contended the bank had no enforceable lien. Judge Yacos concluded that the bank had no enforceable lien against accounts receivable generated by the Chapter 11 debtor in possession, even though the estate benefitted from the use of the proceeds of the prepetition receivables to generate the post-petition receivables. The failure to obtain court authorization for the post-petition credit was fatal, notwithstanding the bank's good faith and the likelihood that the court most likely would have approved of the arrangement had it been brought before the court on notice and a hearing before the conversion to Chapter 7. Significantly, unlike the instant case, the bank had a prior relationship with the debtor in possession and had previously financed the prepetition accounts receivable in the ordinary course of the prepetition debtor's business. The court's statements which are equally applicable in the instant case, are dispositive with respect to the defendant's unauthorized post-petition transaction with the debtor in possession.

Under the present Bankruptcy Code the obtaining of credit authorization can only occur after creditors have been pro-

vided with notice and the court has entered an order authorizing the same. *In re Adamson Co., Inc.*, 29 B.R. 937, 939 (Bankr.E.D.Va.1983). *Cf.* also *In re Sullivan Ford Sales*, 2 B.R. 350 (Bankr.D. Me.1980); *In re Monarch Circuit Industries, Inc.*, 41 B.R. 859, 862 (Bankr.E.D. Pa.1984).

\* \* \* \* \* \*

Both parties were well aware that court approval was required, both with regard to the authority for continued borrowing by the debtor-in-possession, and also with regard to the authorization to permit the floating lien to reach post-petition receivables. And, as indicated above, the use of the cash collateral by the debtor prior to the obtaining of a court order on the stipulated agreement was in fact with the consent of the Bank.

\* \* \* \* \* \*

To accede to the Bank's equitable arguments, however, would be in effect to rewrite the statute and negate important practical considerations underlying the congressional decision to require *prior* approval of continued financing and lien attachment of floating liens *after* notice to creditors in the reorganization proceedings. While the debtor and lender may well agree to a continued financing arrangement, in order to permit the debtor's business operations to continue, the creditors in a particular case may well be of the view that continued business operation is not in their interest and that liquidation is an appropriate alternative. Cf. *In re Texlon Corp.*, [596 F.2d 1092, 1098–1099 (2d Cir.1979)] of course the whole reason for requiring notice to creditors and approval by the court after such notice and hearing.

62 B.R. at 754–56.

An integral part of 11 U.S.C. § 364(c) is the requirement that notice be given to the creditors and a court order be issued before an enforceable secured interest is granted against property of the estate. In *Credit Alliance Corporation v. Dunning-Ray Insurance Agency, Inc. (In re Blumer)*, 66 B.R. 109, 113–14 (Bankr. 9th Cir.1986), the court stated that procedural due process requires that there be "notice and a hearing" within the meaning of 11 U.S.C. § 102(1) for purposes of obtaining secured credit under 11 U.S.C. § 364, even in emergency situations, and that:

> In a judicial proceeding due process requires that individualized notice be given before rights can be affected. *Texaco, Inc. v. Short*, 454 U.S. 516, 534–35, 102 S.Ct. 781, 794–95, 70 L.Ed.2d 738 (1982); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

66 B.R. at 114.

In view of the fact that the defendant may not now assert a Chapter 11 administration claim for the unauthorized post-petition transaction with the debtor in possession, the trustee is entitled to a partial summary judgment with respect to that portion of the defendant's counterclaim which is reflected in the $98,851.14 claim stated in paragraph 16 of the answer. However, this figure also includes the sum of $16,360 which the defendant claims is due for processing services performed for the trustee in bankruptcy in accordance with the stipulation dated April 29, 1985, which was approved by this court by order dated May 7, 1985. The $16,360 sum may qualify for a super priority administration expense claim in the Chapter 7 case over the Chapter 11 administration expense claims, as set forth in 11 U.S.C. § 726(b). Hence, after subtracting $16,360 from the amount of $98,851.14 contained in the defendant's counterclaim, as set forth in paragraph 16 of the answer, the balance of $82,491.14 does not constitute a Chapter 11 administration expense claim because it was incurred during the Chapter 11 case in violation of the requirements expressed in 11 U.S.C. § 364(c). Accordingly, the trustee is entitled to a partial summary judgment dismissing the defendant's counterclaim to the extent of $82,491.14, with the result that the counterclaim set forth in paragraph 16 of the answer shall be reduced to the sum of $16,360.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28

U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

2. The trustee's motion for partial summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56 is denied as to the counterclaim arising under an alleged artisan's lien in the sum of $30,013.55, as set forth in paragraph 15 of the defendant's answer.

3. The trustee's motion for partial summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56 is granted, in part, as to the Chapter 11 administration expense counterclaim of $98,851.14 expressed in paragraph 16 of the defendant's answer. This counterclaim includes the sum of $82,491.14 which was incurred in violation of 11 U.S.C. § 364(c) and does not constitute an allowable Chapter 11 administration expense claim. The claim asserted by the defendant in paragraph 16 of its answer shall be reduced by $82,491.14 to the sum of $16,360.

SETTLE ORDER in accordance with the foregoing.